J-A25012-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.D-W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 827 WDA 2023 |

Appeal from the Order Entered June 12, 2023
In the Court of Common Pleas of Clearfield County Orphans' Court at
No(s):  OC-3685-2022

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: February 9, 2024**

L.D-W. ("Mother") appeals from the June 12, 2023 order involuntarily terminating her parental rights to her biological daughter, A.H., born in March 2020.[1]  After careful consideration, we affirm.

We glean the factual and procedural history of this matter from the certified record, which provides as follows.  Clearfield County Youth and Family Services ("CYS") first became involved with this family in March 2020, when CYS learned that Mother and A.H. both tested positive for amphetamines and methamphetamines at the time of A.H.'s birth.  **See** N.T., 12/22/22, at 7.  On April 8, 2020, CYS was granted emergency custody of A.H., which was confirmed in a shelter hearing held the same day.  **Id**. at 8.  On April 13,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  In a separate order filed the same day, the orphans' court also involuntarily terminated the parental rights of S.H. ("Father"), who did not file an appeal.

2020, A.H. was adjudicated dependent. CYS was awarded legal custody, while A.H. was initially returned to Mother's physical custody. *Id*. at 9.

A.H.'s initial dependency goal was established as reunification and Mother was assigned several permanency goals related to the concerns revealed by CYS's investigations up to that point. She was directed to cooperate with CYS and other service providers, maintain her sobriety, participate in mental health and substance abuse counseling, obtain stable housing, secure consistent employment, and refrain from criminal activity. *See id*. at 7, 15-17. Mother was also ordered to undergo regular urine screenings for substance abuse. In permanency review orders issued between May 2020 and July 2021, the court found Mother's compliance to be minimal.

CYS removed A.H. from Mother's physical custody in July 2020 after Mother again tested positive for methamphetamines. *See id*. at 9-10. Thereafter, she was placed in a foster home with L.H.C. and E.C. (collectively, "Custodians"). Mother was permitted supervised visitations with A.H. several times a week, which she consistently participated in during the dependency proceedings. *See id*. at 24. In December 2020, Mother continued to test positive for methamphetamines and was, ultimately, held in contempt by the dependency court. *Id*. In connection with this finding, Mother participated in an in-patient rehabilitation which concluded in March 2021. *See id*. at 13-14.

Subsequently, however, Mother's urine screens indicated that she continued to abuse methamphetamines upon her release from rehab in March 2021. *See id*. at 15-16. She tested positive for methamphetamines in

screens administered every month during the seven-month period between March 2021 and October 2021. *Id.* In August 2021, Mother underwent a parental capacity evaluation administered by Dr. Bradley Beckwith. Based largely upon Mother's intransigent abuse of illicit substances, Dr. Beckwith recommended that Mother "not serve as the primary parenting resource" for A.H. *See id*. at 50.

Contemporaneously, A.H. became a patient of audiologist Dr. Emily Morris at UPMC Children's Hospital in Pittsburgh, Pennsylvania, after she failed her "newborn hearing screening." *See id*. at 69-70. A.H. was diagnosed with significant hearing loss and was recommended for cochlear implant surgery in her left ear. *See id*. at 70-71. Mother disputed this diagnosis and objected. *See id*. at 10-11. Specifically, Mother was concerned that the surgery would "sever" A.H.'s cochlear nerve and, thereby, preclude Mother from having her voice "encoded" upon the child. *See id*. at 46. Mother was also difficult to communicate with when her consent and input were required on these critical issues. *See id*. at 10. Thus, CYS requested and was granted medical decision-making authority as to A.H. in September 2020. *See id*. at 11.

A.H. underwent successful cochlear surgery in February 2021. *See id*. at 71. She also was fitted with a hearing aid in her right ear. *See id*. at 70. Consequently, A.H. requires frequent check-ups and has significant daily medical needs related to the upkeep of her auditory aids, including regular disassembly, inspection, and replacement of the devices. *See id*. at 78-79. These medical implants also have related software that must be monitored

through a digital device like a cellular telephone. *See id*. at 75. Following this successful medical intervention, A.H. performed "above average" with respect to her developmental milestones. *See id*. at 80.

Ultimately, on October 14, 2021, the dependency court awarded Custodians subsidized permanent legal custody ("SPLC") of A.H.[2] *See id*. at 18. Mother did not file an appeal. While Mother's parental rights were not terminated by this determination, the SPLC order discharged A.H. from dependency, terminated CYS's oversight, and directed that CYS was no longer obligated to provide reunification services to Mother. *Id*. In anticipation of a forthcoming custody complaint from Mother, however, the SPLC order also directed that Mother "shall continue to have weekly visits until an order is entered in the civil docket." *Id*. at 34; *see also In re B.S.*, 861 A.2d 974, 977 (Pa.Super. 2004) (observing that when it is "deemed appropriate," a trial court may "permit continued visitation by the dependent child's natural parents" following an award of SPLC).

The visitation portion of the SPLC order was intended to bridge the gap between the closure of A.H.'s dependency and the anticipated initiation of a custody proceeding by Mother. *See id*. at 96-98. However, Mother did not

---

[2] Subsidized permanent legal custody ("SPLC") is "an arrangement whereby a juvenile court discontinues intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. Parental rights are not terminated." *In re S.H.*, 71 A.3d 973, 977 (Pa.Super. 2013). Additionally, "[t]he custodian is typically provided a financial subsidy for the child by the local county children and youth agency." *Id*.

file a custody complaint concerning A.H., and disputes quickly arose between Mother and Custodians regarding visitations with A.H. *Id*. Specifically, Custodians were concerned that CYS would no longer be providing supervision and drug testing services in connection with Mother's visits. *See id*. at 34-45, 55, 98-99. Conflict also arose when Custodians would not utilize the visitation service provider recommended by Mother since that organization did not provide drug testing. *Id*. In December 2021, Mother filed in the dependency court a petition for contempt against Custodians in connection with Mother's lack of visitation with A.H.

On April 19, 2022, an unrecorded conference was held in chambers on Mother's contempt petition and the parties negotiated a temporary order providing the general parameters for Mother and the Custodians to negotiate a resolution to visitation. *See* Custodians' Exhibit 8 at ¶¶ 1-7. Under the terms of this order, if no agreement was reached within thirty days, Mother was permitted to seek a conference or hearing. *Id*. at ¶¶ 5-6. On May 12, 2022, Custodians' counsel at that time, Joshua S. Maines, Esquire, transmitted a proposal for visitation to Mother's attorney.[3] *See* N.T., 12/22/22, at 34-45, 55, 98-99. Mother did not respond to this communication, nor did she request a hearing or conference before the dependency court.

On June 22, 2022, Custodians filed a petition seeking to involuntarily terminate Mother's parental rights to A.H. pursuant to 23 Pa.C.S. § 2511(a)(8)

_____

[3] Custodians retained separate counsel in these termination proceedings.

and § 2511(b).[4] An evidentiary hearing was held on December 22, 2022, and continued to February 9, 2023, before the same jurist that oversaw A.H.'s dependency proceedings.[5] At this point in time, A.H. was just shy of her third birthday. During the evidentiary proceedings, Custodians testified and presented four witness: Dr. Beckwith, Dr. Morris, Attorney Maines, and CYS caseworker Crystal Miller. Represented by counsel, Mother testified on her own behalf.

On June 12, 2023, the orphans' court filed an opinion and order that involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b) and set forth its rationale. On July 11, 2023, Mother submitted a timely notice of appeal along with a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In lieu of a Rule 1925(a)(2)(ii) opinion, the orphans' court submitted a letter advising

_____

[4] We note that Custodians have both physical and legal custody of A.H. and submitted a report of their intention to adopt A.H. pursuant to 23 Pa.C.S. § 2531. Although no party has challenged Custodians' standing in this matter, we note that they appear to be within the class of individuals entitled to pursue the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2512(a)(3). *See In re Adoption of J.F.*, 572 A.2d 223, 225 (Pa.Super. 1990) (noting that "custody" within the meaning of § 2512(a)(3) "means legal custody, not merely physical custody" (emphasis omitted)).

[5] On September 30, 2022, the orphans' court appointed counsel to advocate for A.H.'s legal interests pursuant to the mandates of 23 Pa.C.S. § 2313(a). The child's best interests were separately represented by a guardian *ad litem* ("GAL"). In this Court, Custodians, legal-interest counsel, and GAL, filed a consolidated brief collectively supporting the order terminating Mother's parental rights.

this Court that it would rely upon the reasoning already set forth in its thoroughly drafted June 12, 2023 opinion and order.

Mother raises the following issues for our consideration:

1.      Did the orphans' court abuse its discretion and commit a reversible error of law when it held the statutory grounds for involuntary termination of Mother's parental rights had been established pursuant to 23 Pa.C.S. § 2511(a)(8) by clear and convincing evidence by Custodians?

2.      Did the orphans' court abuse its discretion and commit a reversible error of law when it held that the statutory grounds for involuntary termination of Mother's parental rights had been established pursuant to 23 Pa.C.S. § 2511(a)(8), by concluding that the conditions which initially led to the child's removal from Mother's care were still in existence?

3.      Did the orphans' court abuse its discretion and commit reversible error of law when it held that terminating Mother's parental rights would best serve the needs of the child?

Mother's brief at 6 (cleaned up).

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial

courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Our analysis concerns § 2511(a)(8) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy § 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017).

Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent

at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009).

Thus, the statute recognizes "that a child's life cannot be held in abeyance

while the parent is unable to perform the actions necessary to assume

parenting responsibilities. This Court cannot and will not subordinate

indefinitely a child's need for permanence and stability to a parent's claims of

progress and hope for the future." ***Id***. at 11-12 (internal citations and

quotation marks omitted). Finally, this Court has also explained that,

> while both [§] 2511(a)(8) and [§] 2511(b) direct us to evaluate
> the "needs and welfare of the child," we are required to resolve
> the analysis relative to [§] 2511(a)(8), prior to addressing the
> "needs and welfare" of [the child], as proscribed by [§] 2511(b);
> as such, they are distinct in that we must address [§] 2511(a)
> before reaching [§] 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

With these overarching legal principles in mind, we turn to Mother's

claims for relief. Although framed separately, we discern that Mother's first

two arguments essentially advance the same claim, namely, that the trial

court's findings pursuant to § 2511(a)(8) were not supported by sufficient

evidence. ***See*** Mother's brief at 9-10 ("The entire testimonial record . . .

demonstrates that the conditions that [led] to the removal of [A.H.] from

Mother's care were no longer in existence, or alternatively, that Mother was

capable of remedying those conditions[.]"). We must disagree.

Mother challenges the orphans' court's findings pursuant to

§ 2511(a)(8) based upon her perspective that the trial court relied upon

assumptions and speculation concerning her behavior in concluding that the

conditions that led to A.H.'s removal continued to exist at the time of termination.[6] *See* Mother's brief at 13-14. Specifically, Mother focuses upon L.H.C.'s admission that she lacked direct knowledge of Mother's condition following the termination of CYS supervision and oversight in October 2021. *See id*. at 13 (citing N.T., 12/22/22, at 176).

However, Mother's arguments ignore the significant evidence that speaks directly to her failure to address the conditions that led to A.H.'s removal. The orphans' court determined that "Mother has not refrained from using illicit substances; she has not refrained from criminal activity; she has not completed drug and alcohol counseling; and she has not maintained safe and stable housing." Orphans' Court Opinion, 6/12/23, at 14. As discussed, *infra*, we find ample support in the certified record for the court's conclusions.

This case revolves around Mother's drug use. Ms. Miller testified extensively regarding Mother's history of substance abuse during CYS's involvement with the case. As detailed above, Ms. Miller's testimony reflects that Mother used amphetamines and methamphetamines during A.H.'s pregnancy. *See* N.T., 12/22/22, at 9-12. Thereafter, Mother continued to abuse the same drugs with impunity, which ultimately resulted in her being jailed for ninety days on contempt of court charges. *See id*. at 12-14. Even following the completion of inpatient rehabilitation, Mother tested positive for

---

[6] There is no dispute that A.H. has been removed from Mother's care for at least twelve months. *See* 23 Pa.C.S. § 2511(a)(8).

methamphetamines every month between March 2021 and October 2021, when dependency was terminated by SPLC. *See id*. at 14-16.

Although there is scarce direct evidence speaking to Mother's continued drug abuse after oversight by CYS ended, that is due largely to Mother's failure to submit to drug tests as a component of her visitations with A.H. Moreover, we find Dr. Beckwith's assessment of Mother to be instructive on the extent to which Mother addressed her substance abuse. Specifically, he reported that during his evaluation, Mother "denied almost all of the allegations of substance use against her" and characterized the evidence of her drug use as fabrications manufactured by CYS caseworkers. *See id*. at 43. Even when she was willing to acknowledge her drug use on a limited basis, Mother attempted to shift blame for her misdeeds upon A.H.'s father and her "other paramours." *See id*. at 44. Critically, Dr. Beckwith's testimony noted that Mother's substance abuse problems would persist "until she took accountability for her actions, sought treatment, and maintained sobriety for a period of one or two years." Orphans' Court Opinion, 6/12/23, at 9 (citing N.T., 12/22/22, at 50).

It is clear from Mother's representations at the termination hearing that she still lacks this necessary ability to take accountability for her actions. Despite the voluminous evidence directly confirming her drug use up until at least October 2021, Mother baldly insisted during her testimony that she ceased abusing drugs in October 2020. *See* N.T., 2/9/23, at 77, 98. The

orphans' court found Mother lacked credibility concerning her alleged sobriety and we are precluded from disturbing such a credibility determination that is supported by the record. *See M.E.*, *supra* at 829-30.

Similarly, while Mother also claimed that she had completed drug and alcohol counseling, she failed to provide any documentary proof or specific information regarding her alleged completion of such a program. *See* N.T., 2/9/23, at 101, 118, 126-27. Relatedly, she also failed to curtail her criminal behavior and has accrued at least eight outstanding cases related to driving with a suspended license, which carries the threat of incarceration. *See id*. at 104-05. Finally, Mother's own testimony indicates that her housing situation has significantly worsened since the close of dependency, as Mother's home has been foreclosed upon due to non-payment. *See id*. at 78, 109. Accordingly, for all the foregoing reasons, the orphans' court did not abuse its discretion in concluding that the conditions that led to A.H.'s removal continued to exist at the time of the termination hearing.

Mother's argument also implicates the parties' failure to reach an agreement concerning visitations prior to the filing of the underlying termination petition. *See* Mother's brief at 10 ("Mother asserts that the evidence introduced at the time of the hearing demonstrates that [Custodians] were extremely difficult to work with, and unilaterally severed [A.H.'s] contact with Mother in an effort to aid their adoption efforts."). While the propriety of the dependency proceedings is not directly before this Court, our review of

those proceedings demonstrates that Mother failed to secure visits due to her own inaction. Specifically, she neglected to institute timely custody proceedings or respond to the visitation proposal advanced by Custodians in May 2022. *See* N.T., 12/22/22, at 34-45, 55, 98-99.

As to the effect of the parties' failure to reach consensus, Mother asserts that Custodians' insistence upon drug testing oversight and third-party supervision created "obstacles" and erected "barriers" that impeded "free communication and regular association'" between Mother and A.H. *See* Mother's brief at 16-17 (quoting *In re B.N.M.*, 856 A.2d 847, 855-56 (Pa.Super. 2004)). The legal authority that Mother invokes for this proposition concerns the termination of parental rights pursuant to § 2511(a)(1), which entails an assessment of whether the parent has "evidenced a settled purpose of relinquishing parental claim to a child **or failed to perform parental duties**." 23 Pa.C.S. § 2511(a)(1) (emphasis added). As part of that evaluation, "[w]here a non-custodial parent is facing termination of his or her parental rights," Pennsylvania courts consider whether "a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent" and the child. *B.N.M.*, *supra* at 855-56.

The orphans' court found this argument unpersuasive. *See* Orphans' Court Opinion, 6/12/23, at 8 ("[T]he argument that [Custodians] erected barriers to prevent Mother from performing parental duties is moot, as

[Custodians] are not seeking termination under an applicable subsection."). We agree with the trial court's interpretation. We emphasize that involuntary termination pursuant to § 2511(a)(8) does **not** involve consideration of the parent's respective ability to perform parental duties or ameliorate the conditions that led to their child's removal. **See M.A.B.**, **supra** at 446. Rather, as outlined in our discussion of the primary component of Mother's argument, in order to preclude termination pursuant to § 2511(a)(8) the record must indicate that the underlying conditions are already fully remedied such that reunification is "imminent." **See I.J.**, **supra** at 11. Thus, Mother's assertion that Custodians erected barriers to impede her communication with A.H. is misplaced.[7]

Although Mother has not advanced any arguments related to the third element of § 2511(a)(8), out of an abundance of caution we will briefly consider the trial court's findings with respect to whether termination would best serve the needs and welfare of A.H. **See J.N.M.**, **supra** at 943. At bedrock, the trial court found that termination was warranted on this point due to Mother having consistently "put her needs ahead of those of the child[.]" Orphans' Court Opinion, 6/12/23, at 14. Again, we agree.

---

[7] Assuming *arguendo* that **In re B.N.M.**, 856 A.2d 847 (Pa.Super. 2004) is pertinent to 23 Pa.C.S. § 2511(a)(8), there is no allegation that Custodians' failure to permit Mother's visits with A.H. had any impact on her ability to address the conditions that first led to the child's removal, *i.e.*, her persistent substance abuse. Hence, the quarrel over Mother's visitations with A.H. is not pertinent to the orphans' court's assessment of § 2511(a)(8).

As detailed at length above, Mother has demonstrated a consistent inability to address the problems that led to A.H.'s removal, which is indicative of her repeated failure to prioritize the needs of her daughter. Moreover, the testimony and documentation provided by Dr. Morris at the termination hearing indicates that Mother's passive attitude also extends to A.H.'s specialized medical needs. Specifically, Dr. Morris testified that Mother did not regularly attend A.H.'s medical appointments and, consequently, did not gain critically important knowledge regarding the upkeep and monitoring of A.H.'s medical implants. *See* N.T., 12/22/22, at 71-75, 87-88. Of nine total medical appointments related to A.H.'s surgical procedure, Dr. Morris averred that Mother attended just one meeting. *See id*. at 87-88, 92. Additionally, Dr. Morris testified that Mother did not independently seek out information, nor did she independently contact the hospital. *See id*. at 78.

By contrast, the record indicates that Custodians have diligently and aptly shepherded A.H. through her medical hardships. Ms. Miller averred that A.H. is "flourishing" with Custodians. *See id*. at 19. Dr. Morris similarly testified that Custodians are attentive with respect to A.H.'s medical needs and, consequently, that the child is now considered developmentally "above average." *See id*. at 80-81.

Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's conclusion that termination would best serve A.H.'s needs and welfare. Therefore, we do not disturb the orphans' court's

determination that involuntary termination was warranted pursuant to § 2511(a)(8). *See J.N.M.*, *supra* at 943.

We now turn to Mother's arguments pursuant to § 2511(b), which largely reiterate the arguments implicating § 2511(a)(8). *See* Mother's brief at 19-21 (repeating earlier arguments). Section 2511(b) requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra* at 267.

Our Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481 (Pa. 1993). Specifically, the orphans' court must render "a determination of whether the bond is necessary and beneficial to the child[.]" *K.T.*, *supra* at 1113. This evaluation involves consideration

of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *E.M.*, *supra* at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse impact" in the termination context. *Id*. at 1111. Specifically, the High Court has cautioned that Pennsylvania courts must not truncate their analysis and preclude severance "based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id*. at 1114.

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, *supra* at 1111 (emphasis in original; cleaned up). Thus, stated generally, we consider factors that arise from the facts of each case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the § 2511(b) analysis." *Id*. at 1109.

In giving primary consideration to the developmental, physical and emotional needs and welfare of A.H., the orphans' court determined that termination was appropriate. *See* Orphans' Court Opinion, 6/12/23, at 18-19 ("[T]ermination of Mother's parental rights would be in the best interest of [A.H.] as Mother has failed to support, nurture, and provide security and stability for [A.H.] and such termination would not cause the severing of a beneficial bond as no bond exists."). We must agree in the orphans' court's assessment.

We first observe that the certified record does not evince a beneficial parental bond between Mother and A.H. aside from Mother's own testimony. It is well ensconced that, "[i]n cases where there is no evidence of any bond between the parent and the child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). Hence, we do not disturb this aspect of the court's determination.

Moreover, assuming *arguendo* that Mother and A.H. share some manner of a bond, it is not of such a nature that severance would predictably cause A.H. "extreme emotional consequences or significant, irreparable harm." *K.T.*, *supra* at 1109-10. Plainly, A.H.'s parental bond lies with Custodians, whose care she has enjoyed for the virtual entirety of her life, from the age of approximately four months. *See* N.T., 12/22/22, at 148. By Mother's own actions and omissions regarding the proposed visitation agreement concerning drug testing, Mother has had no contact with A.H. since CYS ended supervision

in October 2021. During this same time period, by contrast, Custodians have been attentive to A.H.'s needs and development. In particular, L.H.C. testified extensively regarding her close bond with A.H. *See id*. at 146-49.

Overall, we find the orphans' court's summary to be apt: "[Custodians] have been the people [A.H.] turns to for love and comfort. [Custodians] have shown that they are reliable and present for the child; where Mother has been unprepared to assume the responsibilities of parenthood." Orphans' Court Opinion, 6/12/23, at 18. Phrased differently, considering this matter from the child's perspective pursuant to *K.T.*, *supra* at 105, it is apparent that the bond between A.H. and Custodians should be preserved as serving the developmental, physical, and emotional needs and welfare of A.H. In contrast, as we discussed in relation to § 2511(a)(8), the certified record is replete with examples of how Mother minimized A.H.'s interests in favor of her own, and it is apparent that Mother is not equipped to attend to her daughter's needs.

For all the foregoing reasons, we find no abuse of discretion or error of law in the orphans' court's needs-and-welfare analysis pursuant to § 2511(b). Accordingly, we affirm the involuntary termination of Mother's parental rights to A.H. pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/09/2024